## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**CELESTE S.,**

   **Plaintiff,**

            **Case No. 3:20-cv-19046**

  **v.**          **Magistrate Judge Norah McCann King**

**KILOLO KIJAKAZI,**
**Acting Commissioner of Social Security,**

   **Defendant.**

## OPINION AND ORDER

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Celeste S. for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. Plaintiff appeals from the final decision of the Commissioner of Social Security denying that application.[1] After careful consideration of the entire record, including the entire administrative record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f). For the reasons that follow, the Court affirms the Commissioner's decision.

## I. PROCEDURAL HISTORY

On March 4, 2014, Plaintiff filed an application for benefits, alleging that she has been disabled since September 1, 2013. R. 111, 128, 293–95. The application was denied initially and upon reconsideration. R. 152–56, 158–63. Plaintiff sought a *de novo* hearing before an

---

[1] Kilolo Kijakazi, the Acting Commissioner of Social Security, is substituted as Defendant in her official capacity. *See* Fed. R. Civ. P. 25(d).

administrative law judge. R. 164−65. Administrative Law Judge Paul Armstrong ("ALJ Armstrong") held a hearing on June 26, 2017, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert ("2017 hearing"). R. 71−95. In a decision dated August 16, 2017, ALJ Armstrong concluded that Plaintiff was not disabled within the meaning of the Social Security Act from September 1, 2013, Plaintiff's alleged disability onset date, through the date of that decision ("2017 decision"). R. 132−38. However, on October 28, 2019, the Appeals Council granted Plaintiff's request for review and remanded the case to a ALJ for resolution of the following issue:

> In finding the claimant's bipolar and cognitive disorders non-severe, the hearing decision rejected the opinions of the claimant's husband and treating psychologist Sharon Press, Ph.D. (Decision, page 7 citing Exhibits 3E, 16F and 20F). However, the decision does not evaluate the opinions of the State agency medical consultants Turhan Floyd, Ph.D. or Adrienne McKenzie, Ph.D., who both opined that the claimant's affective and anxiety disorders were severe with B criteria under listings 12.04 and 12.06 of moderate, mild, moderate, and none (Exhibit 1A, page 9 affirmed at Exhibit 3A, page 10).
>
> Dr. Floyd further opined that the claimant retained the mental residual functional capacity to "understand, remember and follow simple instructions; make simple decisions; relate, adapt and perform simple routine work-related activities and that he would work best in a low stress work setting with minimal changes in routine." (Exhibit 1A, page 13).
>
> Dr. McKenzie agreed (Exhibit 3A, page 12), further opining that the claimant can understand, remember and carry out simple instructions; is best suited to a position involving limited contact with others; she can avoid ordinary hazards, and changes may be introduced slowly due to claimant's learning concerns (Exhibit 3A, page 14). Further evaluation of the nature, severity, and limiting effects of the mental impairments is warranted.

R. 146. The Appeals Council also directed the ALJ to:

- Further evaluate the claimant's mental impairments in accordance with the special technique described in 20 CFR 404.1520a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 404.1520a(c).

- If available, obtain evidence from a medical expert related to the nature and severity of and functional limitations resulting from the claimant's mental impairments (20 CFR 404.1513a(b)(2)).

- Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p). In so doing, further evaluate the treating source and non-examining source opinions pursuant to the provisions of 20 CFR 404.1527, and explain the weight given to such opinion evidence. As appropriate, the Administrative Law Judge may request the treating source to provide additional evidence and/or further clarification of the opinions and medical source statement about what the claimant could still do despite the impairments through December 31, 2018 (20 CFR 404.1520b). The Administrative Law Judge may enlist the aid and cooperation of the claimant's representative in developing evidence from the claimant's treating source.

- If warranted by the expanded record, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Rulings 83-14 or 85-15). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

R. 147 (remanding to a different ALJ upon Plaintiff's challenge under the Appointments Clause

of the United States Constitution).

On remand, Administrative Law Judge Stephan Bell ("ALJ Bell") held a second hearing

on February 27, 2020, at which Plaintiff, who was again represented by counsel, again testified,

as did a vocational expert. R. 38–70. In a decision dated March 12, 2020, ALJ Bell concluded

that Plaintiff was not disabled within the meaning of the Social Security Act at any time from

September 1, 2013, her alleged disability onset date, through December 31, 2018, the date on

which Plaintiff was last insured. R. 15–26. That decision became the final decision of the

Commissioner of Social Security when the Appeals Council declined review on October 20,

2020. R. 1–6. Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g). ECF No. 1. On

May 12, 2021, Plaintiff consented to disposition of the matter by a United States Magistrate

Judge pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. ECF

No. 10.[2] On that same day, the case was reassigned to the undersigned. ECF No. 11. The matter

is now ripe for disposition.

## II.    LEGAL STANDARD

### A.    Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the

authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204

F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to

determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d

Cir. 2000); *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). The United States Supreme Court has

explained this standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative
> record and asks whether it contains sufficien[t] evidence to support the agency's
> factual determinations. And whatever the meaning of substantial in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial evidence, this
> Court has said, is more than a mere scintilla. It means – and means only – such
> relevant evidence as a reasonable mind might accept as adequate to support a
> conclusion.

*Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal citations and quotation marks

omitted); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal

quotations omitted); *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009)

(citations and quotations omitted); *K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018

---

[2]The Commissioner has provided general consent to Magistrate Judge jurisdiction in cases
seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot
Project (D.N.J. Apr. 2, 2018).

WL 1509091, at *4 (D.N.J. Mar. 27, 2018).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see*, *e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (stating that substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see*

*K.K.*, 2018 WL 1509091, at *4.  The ALJ decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although an ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981).  Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or

without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016). A decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518.

## B.    Sequential Evaluation Process

The Social Security Act establishes a five-step sequential evaluation process for determining whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. § 404.1520(a)(4). "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (citing *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b).  If so, then the inquiry ends because the plaintiff is not disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or combination of impairments that "significantly limits [the plaintiff's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). If the plaintiff does not have a severe

impairment or combination of impairments, then the inquiry ends because the plaintiff is not disabled.  Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id.* at § 404.1509. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC") and determine whether the plaintiff can perform past relevant work. 20 C.F.R. § 404.1520(e), (f). If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). If the ALJ determines that the plaintiff can do so, then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

## III.   ALJ BELL's 2020 DECISION AND APPELLATE ISSUES

The Plaintiff was 58 years old on December 31, 2018, *i.e.,* the date on which she was last insured. R. 17, 25. At step one, ALJ Bell found that Plaintiff had not engaged in substantial gainful activity between September 1, 2013, her alleged disability onset date, and that date. *Id.*

8

At step two, ALJ Bell found that Plaintiff's severe impairments consisted of mental impairments that have been variously diagnosed as major depressive disorder, bipolar disorder, generalized anxiety disorder, and frontotemporal dementia. *Id.*  ALJ Bell also found that Plaintiff's diagnosed diabetes mellitus, degenerative disc disease of the spine, degenerative joint disease of the hips, foot arthritis, hyperlipidemia, hypertension, dermatitis, and coronary disease were not severe impairments. R. 17−18.

At step three, ALJ Bell found that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. R. 18−19.

At step four, ALJ Bell found that Plaintiff had the RFC to perform a full range of work at all exertional levels subject to various non-exertional limitations. R. 20−25. ALJ Bell also found that this RFC did not permit the performance of Plaintiff's past relevant work as a secretary. R. 25.

At step five, ALJ Bell found that a significant number of jobs−*i.e.*, approximately 70,000 jobs as a hand packager; approximately 50,000 jobs as a package sealer; approximately 5,000 jobs as a linen room attendant−existed in the national economy and could be performed by an individual with Plaintiff's vocational profile and RFC. R. 26. ALJ Bell therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act from September 1, 2013, her alleged disability onset date, through December 31, 2018, the date on which she was last insured. *Id.*

Plaintiff disagrees with ALJ Bell's findings at step four and asks that the decision of the Commissioner be reversed and remanded for further proceedings. *Plaintiff's Brief,* ECF No. 15. The Acting Commissioner takes the position that her decision should be affirmed in its entirety because ALJ Bell's decision correctly applied the governing legal standards, reflected

consideration of the entire record, and was supported by sufficient explanation and substantial

evidence. *Defendant's Brief Pursuant to Local Civil Rule 9.1,* ECF No. 16.

## IV.    SUMMARY OF RELEVANT MEDICAL EVIDENCE

### A.    MRFC Opinion of Sharon Press, Ph.D., dated March 20, 2014

On March 20, 2014, Sharon Press, Ph.D., Plaintiff's treating psychologist since October

2013, completed a five-page, fill-in-the-blank, and check-the-box form entitled, "Mental

Residual Functional Capacity Questionnaire" ("2014 MRFC"). R. 1183–87. Dr. diagnosed

depressive psychosis (Axis I 296.22) and Type 2 diabetes (Axis III). R. 1183 (noting additional

psychosocial and environmental factors on Axis IV, including occupational issues and children).

In addressing Plaintiff's treatment and response, Dr. Press noted: "Responded well to meds for

Depression but still has trouble w/ memory, concentration, executive functioning, delay of

gratification, [illegible] & insight. In wkly therapy – progress w/regards to money management."

*Id*. Dr. Press listed Plaintiff's prescribed medications as Abilify, Cymbalta, Crestor, and

"Junevia" (possibly intended to be "Januvia," which is used to treat diabetes). *Id*. Asked to

describe any side effects of these medications, Dr. Press wrote, "NA." *Id*. Asked to describe her

clinical findings, including results of mental status examinations that demonstrate the severity of

Plaintiff's mental impairment and symptoms, Dr. Press responded: "pt has significant memory

loss, inattentiveness, distractibility, trouble multi-tasking, decreased verbal skills, lack of insight

and motivation, impulsivity, and lethargy. These persist in spite of treatment with medication."

*Id*. Plaintiff's prognosis was guarded. *Id*.

Dr. Press noted Plaintiff's signs and symptoms as anhedonia or pervasive loss of interest

in almost all activities; appetite disturbance with weight change; decreased energy; blunt, flat or

inappropriate affect; impairment of impulse control; poverty of content of speech; difficulty

thinking or concentrating; psychomotor agitation or retardation; change in personality; recurrent obsessions or compulsions which are a source of marked distress; psychological or behavioral abnormalities associated with a dysfunction of the brain with a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities; flight of ideas; loosening of associations; illogical thinking; easy distractibility; memory impairment – short, intermediate, or long term; sleep disturbance; decreased need for sleep; and loss of intellectual ability of 15 IQ points or more. R. 1184.

Dr. Press assessed Plaintiff's ability to perform work-related activities on a day-to-day basis in a regular work setting, using the following scale: "Unlimited or very good"; "Limited but satisfactory"; "Seriously limited, but not precluded[,]" which "means ability to function in this area is seriously limited and less than satisfactory, but not precluded in all circumstances[;]" "Unable to meet competitive standards[,]" which means "cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting[;]" and "No useful ability to function[,]" or "extreme limitation," which means "cannot perform this activity in a regular work setting." R. 1185. Dr. Press specifically opined that, as to Plaintiff's mental abilities and aptitudes needed to do unskilled work, Plaintiff had a limited, but satisfactory ability to ask simple questions or request assistance and to be aware of normal hazards and take appropriate precautions. *Id*. Plaintiff had a seriously limited but not precluded ability to remember work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; and make simple work-related decisions. *Id*. However, Plaintiff was unable to meet competitive standards in her ability to maintain attention for a two-hour segment; work in

coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a work setting; and deal with normal work stress. *Id.* When asked to explain Plaintiff's limitations of seriously limited but not precluded and unable to meet competitive standards and to include the medical / clinical findings that support the assessment, Dr. Press responded as follows: "memory / inattentiveness seriously limit client's ability to do new activities and function independently[.]" *Id*. As to Plaintiff's mental abilities and aptitudes needed to do semiskilled work, Dr. Press opined that Plaintiff had a seriously limited, but not precluded ability to understand and remember detailed instructions, but was unable to meet competitive standards in her ability to carry out detailed instructions, set realistic goals or make plans independently of others, and deal with the stress of semiskilled and skilled work. R. 1186. When asked to explain these limitations and to include the medical / clinical findings that support the assessment, Dr. Press responded as follows: "Memory & Executive function handicaps seriously limit ability to do semi-skilled work[.]" *Id*. As to Plaintiff's mental abilities and aptitude needed to do particular types of jobs, Dr. Press opined that Plaintiff had a limited, but satisfactory, ability to interact appropriately with the general public; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; travel in unfamiliar place; and use public transportation. *Id*. Dr. Press noted that Plaintiff had a low IQ or reduced intellectual functioning, explaining that "pt is being tested – decreased IQ in low average range, impaired memory for new information, and [illegible]." *Id*.

12

According to Dr. Press, Plaintiff's psychiatric condition does not exacerbate her experience of pain or other physical symptoms. *Id*. Dr. Press opined that Plaintiff's impairments or treatment would cause her to be absent from work about four days per month. R. 1187. Her impairment has lasted or could be expected to last at least twelve months. *Id*. Dr. Press denied that Plaintiff was a malingerer and affirmed that Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation. *Id*. When asked to describe additional reasons why Plaintiff would have difficulty working at a regular job on a sustained basis, Dr. Press responded: "Pt's cog functioning has declined significantly in past 6 months and it is unclear if this is continuing[.]" *Id*. Dr. Press denied that Plaintiff's impairments included alcohol or substance abuse and denied that Plaintiff could handle benefits in her own best interest. *Id*.

### B.    Psychological Testing on May 1, 2014

On May 1, 2014, Dr. Press administered a series of psychological tests, including the Wechsler Adult Intelligence Scale-Fourth Edition ("WAIS-IV"), the Wechsler Memory Scale-Fourth Edition ("WMS-IV"), the Wechsler Individual Achievement Tests Third Edition ("WIAT III), the Bender Gestalt Test-Second Edition ("BG-II"), and the Behavior Rating Inventory of Executive Function ("BRIEF"). R. 560−86. Dr. Press noted, *inter alia*, that Plaintiff's general cognitive ability was in the low average range of intellectual functioning, as were her verbal and nonverbal reasoning abilities. R. 562−67. Her ability to sustain attention, concentrate, and exert mental control was in the average range. R. 568−69. Her performance on the WMS-IV revealed, *inter alia*, that her auditory memory fell in the average range, and that her visual memory fell in the borderline range. R. 569−72. Her immediate and delayed memory fell in the low average range. R. 573−74. Dr. Press summarized Plaintiff's performance on these tests as follows:

Celeste is a 54-year-old woman. She was referred to this psychologist by her neurologist. She was referred for an assessment, as well as treatment of depression, anxiety, inattentiveness, and significant memory loss that had been evidenced within the past four months. Celeste was taking an antidepresant, but the symptoms of depression had not abated. Additionally she was extraordinarily inattentive, her affect was flat, she was fatigued constantly, and was unable to function beyond the basics in her daily life. She had recently gained 30 pounds, had developed Type II diabetes, and was on a leave of absence from work because of declining performance. Her poor performance from work was especially concerning for her husband because prior to this she had always excelled at work. At home she reported 1hat she spent a great deal of time playing on her i-phone and no longer engaged in long complex conversations with family or friends. Celeste demonstrated little self awareness regarding the changes in her functioning. While she knew she sometimes forgot things she was unaware of how much she forgot. Her inability to reflect on her behavior and evaluate and modify her behavior was negligible when this psychologist first started seeing her. As she became less depressed she remained immature in her presentation and would laugh in a silly way when she heard her family members talk about her behaviors. While Celeste's depression is well managed at this point she continues to have difficulty with memory, distractibility, executive functioning, impulse control, abstract reasoning, self monitoring, emotional maturity, novel tasks, and managing complex verbal tasks. She has trouble with reading comprehension and following simple, new things she watches on TV. The decrease in her ability to track what she reads and watches on TV is especially evident over the past month.

This psychologist decided to assess Celeste cognitively once her depression had been successfully treated with medication. The assessment was completed in two steps, the assessment of cognitive process, intellectual skills, and executive functioning in February 2014 and an assessment of achievement in April.

Her IQ was assessed with the W AIS-IV. Her general cognitive ability, as estimated by the WAIS-IV, is in the low average range (FSIQ = 86). Celeste's verbal comprehension and perceptual reasoning abilities were both found to be in the low average range (VCI = 89, PRI = 84). Her performance on the PRI subtests indicated that she has the greatest difficulty with spatial organization and visual motor integration. Celeste's ability to sustain attention, concentrate, and exert mental control is in the average range (WMI = 100). However, she showed a significant weakness on the tests which involved both registration and manipulation, not just registration. Celeste's ability in processing simple or routine visual material without making errors is in the low average range when compared to her peers (PSI= 86). Her processing speed was slowest on the test of scanning, cognitive flexibility, and visual discrimination.

Celeste was administered 10 subtests of the adult battery of the WMS-IV. Celeste's ability to listen to oral information and repeat it immediately, and then recall the information after a 20 to 30 minute delay is in the Average range. Her memory for

visual details and spatial location is in the Borderline range. It is important to note modality-specific differences between her auditory and visual memory. Compared to individuals with similar auditory memory capacity, Celeste's visual memory performance is in the Borderline range, indicating that her visual memory is much lower than expected, given her level of auditory memory functioning. Her ability to temporarily hold and manipulate spatial locations and visual details is in the Borderline range. Compared to individuals with similar visual working memory capacity, Celeste's visual memory performance is in the Low Average range, indicating that her visual memory is lower than expected, given her level of visual working memory functioning. Celeste's ability to recall verbal and visual information immediately after the stimuli is presented is in the Low Average range. Her ability to recall verbal and visual information after a 20 to 30 minute delay is in the Low Average range. Celeste displayed a notable amount of forgetting between the immediate and delayed tasks of the WMS-IV. Compared to individuals with a similar level of immediate memory capacity, Celeste's delayed memory performance is in the Low Average range, indicating that her delayed memory is lower than expected given her level of initial encoding. Overall, Celeste's performance improves when she is asked to recognize previously presented information, than when she is asked to recall both verbal and visual information. Celeste's memory is lower than expected in visual and delayed memory arenas based on her WAIS-IV IQ and GAI.

Celeste's achievement test scores indicated that there is variability in the development of Celeste's achievement in the areas of reading, mathematics, written expression, and oral expression skills. Specifically, she was weaker in her functioning in the areas of reading comprehension and oral expression. Her mathematic reasoning skills were her best developed skills.

Celeste's skills with the visual motor tasks of the Bender Gestalt II were average. Her performance was better than expected given her performance on the WMS-IV. This is most likely related to the fact that when she is copying designs and does not have to use her memory to guide her drawing she can both reproduce and remember geometric forms at a higher level. She did demonstrate deficits in areas of executive functioning over the years assessed by the BRIEF-A. Her husband endorsed significant weakness in all areas of Metacognition, while Celeste did not note any problems in any executive functioning arena. This is not a surprise given her limited self-awareness skills.

R. 584–85. Dr. Press went on to make the following diagnostic considerations and

recommendations:

Celeste presents with symptoms involving behavioral change, depressive symptomatology, emotional blunting, immaturity, memory and cognitive decline involving spatial organization deficits, executive functioning skills, and verbal decline, distractibility, and loss of motivation. These symptoms are suggestive of a

15

neurobehavioral dementia; most likely a frontal temporal dementia affecting executive function, mood, and behavior. Decline in functioning since this psychologist began seeing Celeste (over the past 6 months) is noted, primarily increasing decline in attentional ability, emotional maturity, and executive functioning skills.

**Recommendations**

1. Celeste should be evaluated by a neurologist for further evaluation of her symptoms and an exploration of underlying structural changes.
2. Behavioral and cognitive changes should be addressed through medication.
3. Celeste and her husband should continue in therapy to help with both the understanding of Celeste's disorder as well as aid them in the adjustment to the changes in Celeste.
4. Working with Celeste using cognitive behavioral therapy has helped Celeste manage the changes she is experiencing and should continue.
5. Cognitive changes should be addressed through cognitive rehabilitation aimed at improving memory functioning and executive functioning skills.

R. 585−86.

**C.    MRFC Opinion of Sharon Press, Ph.D., dated May 23, 2016**

On May 23, 2016, Dr. Press completed a five-page, fill-in-the-blank, and check-the-box form entitled, "Mental Residual Functional Capacity Questionnaire" ("2016 MRFC"). R. 770−74. Dr. Press noted that she had treated Plaintiff on a weekly basis since October 17, 2013. She diagnosed major depression, recurrent (moderate with mixed features), personality change due to another medical condition (diabetes), and occupational problems. R. 770. In addressing Plaintiff's treatment and response, Dr. Press stated: "client is less vegetative, depressed, distracted, disorganized, than when she started treatment however she now continues to be extremely anxious, labile, and has significant difficulty consistently self-soothing[.]" *Id*. Plaintiff had no side effects to the prescribed Cymbalta and Wellbutrin. *Id*. When asked to describe her clinical findings, including the results of mental status examinations that demonstrate the severity of Plaintiff's mental impairment and symptoms, Dr. Press responded as follows:

16

> client is grounded in time, place, & person. She [is] moody, easily overwhelmed by stress, and quick to frustrate when her needs are not being met by significant others she will retreat when she feels she cannot cope w/ small stressors & easily derail her functioning. Currently, she is only able to handle routine self care and household tasks. When stressed she will forget to eat properly, monitor her diabetes, and will forget appointments. High blood sugar levels further impair her cognitive functioning. Recently bouts of crying, decreased self-esteem, and suicidal ideation have been present.

*Id*. Plaintiff's prognosis was guarded. *Id*.

Plaintiff's signs and symptoms were described as decreased energy; blunt, flat or inappropriate affect; feelings of guilt or worthlessness; impairment of impulse control; generalized persistent anxiety; somatization unexplained by organic disturbance; mood disturbance; difficulty thinking or concentrating; psychomotor agitation or retardation; persistent disturbances of mood or affect; change in personality; recurrent obsessions or compulsions which are a source of marked distress; persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity or situation; hyperactivity; motor tension; emotional lability; illogical thinking; pressures of speech; easy distractibility; loss of intellectual ability of 15 IQ points or more; and recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once per week. R. 771.

Dr. Press assessed Plaintiff's ability to do work-related activities on a day-to-day basis in a regular work setting, using the same scale as she did in the 2014 MRFC. R. 772−73. As to Plaintiff's mental abilities and aptitudes needed to do unskilled work, Plaintiff had an unlimited or very good ability to maintain regular attendance and be punctual within customary, usually strict tolerances and to make simple work-related decisions. R. 772. Plaintiff had a limited, but satisfactory ability to understand and remember very short and simple instructions; carry out very short and simple instructions; sustain an ordinary routine without special supervision; work

17

in coordination with or proximity to others without being unduly distracted; perform at a consistent pace without an unreasonable number and length of rest periods; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and respond appropriately to changes in a work setting. *Id*. Plaintiff had a seriously limited but not precluded ability to remember work-like procedures; maintain attention for a two-hour segment; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and be aware of normal hazards and take appropriate precautions. *Id*. However, Plaintiff was unable to meet competitive standards in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and deal with normal work stress. *Id*. As to Plaintiff's mental abilities and aptitudes needed to do semiskilled work, Dr. Press opined that Plaintiff had a limited but satisfactory ability to set realistic goals or make plans independently of others, and a seriously limited, but not precluded, ability to understand and remember detailed instructions, and to carry out detailed instructions. R. 773. However, Plaintiff was unable to meet competitive standards in her ability to deal with stress of semiskilled and skilled work. *Id*. Asked to explain her assessment of Plaintiff's seriously limited, but not precluded, ability to meet competitive standards, and to include the medical / clinical findings that support that assessment, Dr. Press responded: "memory impairment, executive functioning deficits and impaired stress management ability impairs client from functioning beyond basics. She is challenged when trying to follow thru with directions, begin new tasks. Confusion and agitation may result. This will impair job performance." *Id*. As to Plaintiff's mental abilities and aptitude needed to do particular types of jobs, Dr. Press opined that Plaintiff had an unlimited or very good ability to adhere to basic standards of neatness and cleanliness; travel in unfamiliar places; and use public transportation, and a limited, but satisfactory, ability to interact

18

appropriately with the general public and maintain socially appropriate behavior. *Id.*

Asked whether Plaintiff's psychiatric condition exacerbated her experience of pain or other physical symptoms, Dr. Press answered in the affirmative, explaining, "TMJ & arthritis are markedly more painful and debilit[ating] when she experiences stress and the resultant anxiety." *Id.* Dr. Press went on to opine that Plaintiff's impairments or treatment would cause her to be absent from work about four days per month. R. 774. Plaintiff's impairment has lasted or could be expected to last at least twelve months. *Id.* Dr. Press denied that Plaintiff was a malingerer and affirmed that Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation. *Id.* According to Dr. Press, "[W]hen client is stressed she manages best by withdrawing from stressful situation. She will inappropriately engage in obsessive-compulsive behaviors to soothe herself." *Id.* Dr. Press denied that Plaintiff's impairments included alcohol or substance abuse and indicated that Plaintiff could manage benefits in her own best interest. *Id.*

### D. Letter Opinion of Sharon Press, Ph.D., Dated May 2017

In May 2017,[3] Dr. Press authored a three-page, single-spaced, typed letter, bearing the title, "Therapeutic Overview" ("May 2017 Therapeutic Letter"). R. 1115−17. After detailing Plaintiff's psychiatric history, R. 1115, Dr. Press explained that she had focused on managing the symptoms of Plaintiff's depression for the first 18 months of treatment. R. 1116. Although Plaintiff "was still not doing very much out of the house she began to occasionally make dinner and to try and be more attentive to previous tasks that had interested her." *Id.* Dr. Press described Plaintiff's psychological testing and functioning as follows:

Since her depression had abated a full cognitive evaluation was completed. Results

---

[3] While the letter opinion itself is undated, the cover page bears a date of May 23, 2017, and indicates that the request scope of review is "May 2, 2014 to Present." R. 1114.

of testing found Celeste to be functioning in the low average range on a test of adult intelligence, the (WAIS-IV). She showed significant weakness with memory and processing speed. She was found to be having great difficulty with reading and oral expression, as well as executive functioning skills, self- help skills, and self-awareness. Results of the testing supported a diagnosis of dementia, as well as depression and anxiety. She was referred to a neurologist at the University of Pennsylvania by this psychologist. The preliminary evaluation at University of Pennsylvania suggested that she may have atypical dementia. Doctors were unsure of the etiology of this depression. The depression continued to keep Celeste from taking a more active, motivated role in her own life, and her psychiatrist prescribed Wellbutrin.

After approximately a month Celeste became. . . less vegetative and her mood and cognitive deficits improved significantly. Over the next 6 months Celeste's functioning continued to improve and she was less impulsive and did a better job taking care of her physical health. She developed a better ability to do more at home to take care of her house. She could regularly exercise, engage in healthy social relationships. and begin to have more positive interpersonal relationships. As Celeste felt better, she talked of the need to be able to contribute financially to her family and to have a regular part time job. Celeste began to look for a job and volunteered a few hours a week at a yoga and new age book store. As Celeste thought more about getting a part time job and was going to set up interviews her anxiety increased significantly and she found reasons why she thought she could not handle a job. She clearly remained quite concerned that she could not handle a job without regressing and functioning the way she had during the spring and summer of 2013. This psychologist worked with Celeste to realize that she was not yet ready to work a part time job and she needed to focus on her emotional stability and not trying to make money right now.

With less internal pressure to get a job Celeste's functioning stabilized until the late spring of 2016. At that time, she developed an allergic reaction to the medication she was taking to manage her mood instability and she had to stop taking this medication. Without this medication. she began to get more depressed, her anxiety increased and she started becoming extremely agitated with her husband. Celeste began to focus on the traumas from her past and felt she needed to see her mother, father, and son to get away from her husband and repair old relationships. She returned from this trip still highly agitated when with her husband. Symptoms of depression were still evident. As the summer progressed Celeste continued to struggle with symptoms of depression and anxiety. She came to treatment less frequently and she felt that all she primarily needed [was] to focus on her spirituality, yoga, mindfulness, and her garden. When Celeste did come into therapy she would appear slightly agitated, distractable, and emotionally fragile. By the later fall, Celeste was less and less stable, but was reluctant to discuss any other medication with her psychiatrist. She felt she could stabilize herself and did not need a different medication.

In December 2016 Celeste came into session and was agitated, tangential, and suffering from delusions. She had not slept for 72 hours and was emotionally unsettled. Based on threats she had made to her husband this psychologist referred [Plaintiff and her husband] to the emergency room. Celeste was ultimately committed to Carrier Clinic as she was not willing to sign herself into treatment Celeste remained in inpatient treatment for approximately two weeks and was then referred to a partial hospital and then IOP at High Focus Center in Lawrenceville. While in treatment Celeste suffered a life-threatening reaction to her antipsychotic medication, which led to a hospitalization and treatment with steroids and other medications to control her severe allergic reactions. She has not been on psychiatric medication since this time. Celeste returned to outpatient treatment approximately 5 weeks ago and is clearly more settled and stable than she was when she was hospitalized in December 2016.

Although Celeste is more stable than she was five months ago, she is depressed, unmotivated, and struggling on a day to day basis to find a reason to get out of bed. While seeing her granddaughter is very motivating for her, as is her planning of social events, she is not fulfilled on any level on a day to day basis. She is still traumatized by the medical problems created by her medication regime. It is only two weeks since she has not experienced any negative effects from her previous medication regime. Celeste is finding herself wanting to use alcohol to manage her mood and give her a boost during the day. Recently, she has even considered trying anther medication because of her depression and lack of motivation.

In summary, Celeste [], age 57 has been suffering from significant emotional problems since summer, 2013. *Currently, she meets criteria for bi-polar disorder and has recently experienced a significant bout of mania with delusions and psychotic thinking, Celeste suffers from depression and mood instability most the time. She sleeps a great deal of the time* and is feeling a lot of guilt and remorse for what has happened and how her inability to worked has impacted the financial stability of her family. *Due to significant allergic side effects from the mood stabilizing medications she has taken, she is unable to take mood stabilizing medications currently used to treat bi-polar symptoms. At the current time, she is unable to manage money, follow through with executive functioning tasks, and motivate herself to do things she does not enjoy, i.e. cleaning up after herself and limiting her spending of money.* She is not able to get herself to exercise regularly, she does not manage her diabetes by eating properly, she sleeps a great deal, and *cannot find activities other than watching TV to occupy her time.* Clearly, *she is unable to hold a job* as she cannot create the structure and motivation necessary on a day to day to engage in normal activities. Given the seriousness of her emotional difficulties and her inability to be stabilized on medication, *it is highly unlikely that she would be able work now or in the future.*

R. 1116–17 (emphasis added).

**E.      Letter Opinion of Sharon Press, Ph.D., Dated February 20, 2020**

On February 20, 2020, Dr. Press authored a two-page, single-spaced, typed letter, bearing the title, "Therapeutic Overview" ("February 2020 Therapeutic Letter"). R.1411–12. Dr. Press detailed Plaintiff's psychiatric history, including Plaintiff's past "questionable psychiatric treatment" from 2016 until May 2017 and inpatient treatment. R. 1411. Dr. Press went on to describe Plaintiff's subsequent care and status, including improved functioning with new medication, as follows:

> Slowly over time with support from this therapist, her husband, and children she began to heal emotionally, but still presented as lethargic, inattentive, anxious, depressed and angry at the medical establishment. At other times she was also anhedonic. She demonstrated little ability to function within the home setting. Her husband needed to do most of the household tasks, be emotionally very supportive and walked on egg shells at all times with Celeste. Celeste's self care skills were limited and she began smoking again. The fact that she had COPD did not keep her from smoking regularly. She had difficulty monitoring and managing her diabetes and gained weight.

> As Celeste trusted more she felt renewed physical and emotional strength, she engaged more in supportive therapy and some tasks at home. Some instability was noted, but she would not consider the possibility of taking any medication again. Eventually, in June of 2017 Celeste agreed to consider taking medication again. Lithium was prescribed by Celeste's psychiatrist. This medication slowly helped her depression to lift slightly and she became less agitated. She demonstrated improvement in her functioning by the fall of 2018. She participated more in household tasks, i.e. cooking, cleaning, and organizing of house, Celeste did at times take care of her granddaughter with the help of her husband and son. She was not exercising, doing yoga, meeting with friends, or generally enjoying her life. At times she talked of not taking her medication and was quite fearful of any indications of a possible rash on her hands or feet. She would become agitated when thinking about any stressful situations in her life.

> *By Christmas 2018, Celeste was better than she had been, she was healing emotionally and she began to return to exercise, yoga and healthier eating. She did continue to smoke.* Celeste did talk of missing her ability to enjoy her life and the things she was doing. *Over time, working with her psychiatrist, her lithium dosage was changed and her level of depression decreased.* She became more connected with husband, this therapist, friends, and both her children.

> *In Spring of 2019 Celeste's lithium dosage was changed again because Celeste was*

*depressed about her inability to enjoy her life. Celeste's emotional and physical energy increased, her mood was brighter, she started caring about exercise, eating healthier again, and participating in household tasks. She was again exercising, doing yoga, seeing friends, and enjoying her life.*

*This improved functioning continues to date. However, Celeste is easily stressed by her children, memories and incidents from the past, and day to day monetary concerns.* She needs to stay emotionally distant from stressful situations with her husband, children, grand daughter, and financial concerns. *She is easily triggered to irritability, hostility, and anger if things do not go as she would like them to go or if she believes she is being criticized. Her routine is very important to her and she will make decisions about her commitment to family tasks based on whether or not they will disrupt her exercise routines and other self care tasks. With this adherence to routines, limited household responsibilities and avoidance of stressful situations Celeste can stay balanced and in a good mood.* She uses therapy to discuss difficult situations, release her frustration and anger, and reestablish emotional stability if she is feeling dysregulated.

In the future, maintaining her medication regime, continuing in supportive therapy and limiting her involvement in stressful social interactions are important for Celeste's well being. Celeste is learning to maintain distance, recognize when she needs to retreat and back off, and focus on what she needs, not what others need. *While she is more stable she is likely to regress if she cannot maintain her routine, limit daily tasks to small commitments, or is exposed to emotionally and physically taxing situations.* Given her history and periods of extreme emotional instability in the past six years *she is always at risk for future disabling cognitive distortions and the resulting emotional and behavioral breakdowns. These can lead to her once again becoming dangerous to self and others and significant inability to function* in the normal world of her family and everyday life with her children and granddaughter.

R. 1411–12 (emphasis added).

## V.   DISCUSSION

### A.   Opinions of Treating Psychologist, Sharon Press, Ph.D.

Plaintiff argues, *inter alia*, that ALJ Bell erred when weighing Dr. Press's opinions.

*Plaintiff's Brief*, ECF No. 15, pp. 9–21. This Court disagrees.

An ALJ must evaluate all record evidence in making a disability determination. *Plummer,* 186 F.3d at 433; *Cotter,* 642 F.2d at 704. The ALJ's decision must include "a clear and satisfactory explication of the basis on which it rests" sufficient to enable a reviewing court "to

23

perform its statutory function of judicial review." *Cotter*, 642 F.2d at 704–05. Specifically, the ALJ must discuss the evidence that supports the decision, the evidence that the ALJ rejected, and explain why the ALJ accepted some evidence but rejected other evidence. *Id*. at 705–06; *Diaz v. Comm'r of Soc. Sec*., 577 F.3d 500, 505–06 (3d Cir. 2009); *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001) ("Although we do not expect the ALJ to make reference to every relevant treatment note in a case . . . we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law."). Without this explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705; *see also Burnett,* 220 F.3d at 121 (citing *Cotter*, 642 F.2d at 705).

For claims filed before March 27, 2017,[4] "'[a] cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Nazario v. Comm'r Soc. Sec*., 794 F. App'x 204, 209 (3d Cir. 2019) (quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)); *see also Brownawell v. Comm'r of Soc. Sec*., 554 F.3d 352, 355 (3d Cir. 2008) (stating that an ALJ should give treating physicians' opinions "great weight") (citations omitted); *Fargnoli*, 247 F.3d at 43 (3d Cir. 2001) (stating that a treating physician's opinions "are entitled to substantial and at times even controlling weight") (citations omitted). However, "[a] treating source's opinion is

---

[4] As previously noted, Plaintiff's claim was filed on March 4, 2014. For claims filed after March 27, 2017, the Commissioner's regulations eliminated the hierarchy of medical source opinions that gave preference to treating sources. *Compare* 20 C.F.R. § 404.1527 *with* 20 C.F.R. § 404.1520c(a) (providing, *inter alia*, that the Commissioner will no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources").

not entitled to controlling weight if it is 'inconsistent with the other substantial evidence in [the] case record.'" *Hubert v. Comm'r Soc. Sec.*, 746 F. App'x 151, 153 (3d Cir. 2018) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also Brunson v. Comm'r of Soc. Sec.*, 704 F. App'x 56, 59–60 (3d Cir. 2017) ("[A]n ALJ may reject the opinion of a treating physician when it is unsupported and inconsistent with the other evidence in the record."). "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (internal quotation marks and citations omitted). The ALJ must consider the following factors when deciding what weight to accord the opinion of a treating physician: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the record as a whole; (5) the treating source's specialization; and (6) any other relevant factors. 20 C.F.R. § 404.1527(c)(1)–(6). Accordingly, "the ALJ still may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" *Sutherland v. Comm'r Soc. Sec.*, 785 F. App'x 921, 928 (3d Cir. 2019) (quoting *Morales*, 225 F.3d at 317); *see also Nazario*, 794 F. App'x at 209–10 ("We have also held that although the government 'may properly accept some parts of the medical evidence and reject other parts,' the government must 'provide some explanation for a rejection of probative evidence which would suggest a contrary disposition.'") (quoting *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994)); *Morales*, 225 F.3d at 317 ("Where . . . the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit[.]"); *Cotter*, 642 F.2d at 706–07 ("Since it is apparent that the ALJ cannot reject evidence for no reason or for the

wrong reason, . . . an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper.") (internal citation omitted).

At step four of the sequential evaluation process, ALJ Bell found that Plaintiff had the RFC to perform a full range of work at all exertional levels but with certain non-exertional limitations, as follows:

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can never work at unprotected heights, never work with moving mechanical parts, and can never operate a motor vehicle. She is able to perform simple, routine, and repetitive tasks and make simple work-related decisions. She can occasionally interact with supervisors, coworkers, and the public.

R. 20. In reaching this determination, ALJ Bell, *inter alia*, assigned "little weight" to Dr. Press's opinions, reasoning as follows:

> Sharon Press, PhD, a treating psychologist, has also submitted multiple assessments and letters in connection with this application. I give these assessments and letters little weight. Although Dr. Press is a treating physician, her statements that the claimant is unable to work are on an issue reserved to the Commissioner, and the letters submitted do not provide a function-by-function analysis of the claimant's work-related abilities (20F, 28F). Further, the factual statements providing support in the letters indicating that the claimant cannot work are not entirely consistent with the claimant's actual functioning as reported during treatment and other examinations. For example, Dr. Press'[s] notation that the claimant is unable to do anything other than watch TV is inconsistent with the claimant's reported ability to cook, clean, go to exercise classes, and perform childcare (20F/4).
>
> The assessment forms submitted by Dr. Press are also generally checkbox forms with scant written support for each finding, decreasing the probative value of the opinion (16F, 22F). The March 2014 assessment was also completed shortly after the alleged onset date, and as noted above, the record documents improvement and stabilization in the claimant's conditions with continued treatment. This assessment also indicates that the claimant is seriously limited or unable to meet standards in most areas of mental functioning with the need to miss four days of work per month. However, these indications, including serious[] limitation in even carrying out simple instructions, are inconsistent with the claimant's reported ability to cook, clean, shop, drive, and spend time with friends that same month (5E). The

26

assessment form is also inconsistent with the claimant's consultative examination findings less than 12 months from the alleged onset date, which documented generally mild objective deficits on exam (8F). Dr. Floyd and Dr. McKenzie[5] also reviewed evidence from this period and found that the claimant had at most, moderate limitation, and for the reasons noted above, the opinions of Dr. Floyd and Dr. McKenzie are given greater weight.

Dr. Press's 2016 assessment indicates that the claimant is still seriously limited or unable to meet standards in multiple areas of functioning, such as remembering procedures, maintaining attention for two hours, completing a day without interruption, dealing with work stress, and carrying out detailed and complex work (16F). Some of these limitations are not inconsistent with the limitation to simple work described above. Still, to the extent this assessment indicates the need for significant interruption more than customary breaks and the inability to handle even simple work, it is inconsistent with the overall record, including the claimant's general stabilization with continued treatment, the claimant's ability to perform daily activities as described above, the claimant's generally adequate cognitive

---

[5] Turhan Floyd, Ph.D., and Adrine McKenzie, Ph.D., reviewed the record on behalf of the state agency on November 3, 2014, and on May 4, 2015, respectively. R. 96–110, 112–27. The ALJ assigned "great weight" to these opinions, reasoning as follows:

> I also give great weight to the opinions of Turhan Floyd, PhD, and Adrienne McKenzie, PhD, that the claimant's mental conditions are severe and cause moderate limitation (1A, 3A). Dr. Floyd further opined that the claimant retained the mental residual functional capacity to "understand, remember and follow simple instructions; make simple decisions; relate, adapt and perform simple routine work-related activities and that he would work best in a low stress work setting with minimal changes in routine." Dr. McKenzie agreed, further opining that the claimant can understand, remember and carry out simple instructions; is best suited to a position involving limited contact with others; she can avoid ordinary hazards, and changes may be introduced slowly due to claimant's learning concerns.
>
> Dr. Floyd and Dr. McKenzie are familiar with the Regulations, and they were able to review the evidence of record available to them at the time the opinions were rendered, increasing the probative value of the opinions. The opinions are also not inconsistent with the range of simple work described above with only simple decisions and occasional interaction with others, and these limitations are consistent with the overall record, including the claimant's generally stabilized anxiety and depression despite the claimant's need for ongoing medication and counseling, along with the claimant's adequate mini-mental status examinations and ability to perform daily activities as described above, such as laundry, cooking, and childcare.

R. 23.

status at neurological follow up treatment visits, and the opinions of Dr. Floyd and Dr. McKenzie. For these same reasons, the need to miss four days of work per month is also inconsistent with the record as a whole.

R. 23−24. Substantial evidence supports ALJ Bell's reasoning in this evaluation of Dr. Press's opinions. *See* 20 C.F.R. § 404.1527(c)(1)−(4), (6); *Louis v. Comm'r Soc. Sec.*, 808 F. App'x 114, 118 (3d Cir. 2020) ("Whether or not Louis can perform occupational duties is a legal determination reserved for the Commissioner.") (citing 20 C.F.R. § 404.1527(d)); *Galette v. Comm'r Soc. Sec.*, 708 F. App'x 88, 91 (3d Cir. 2017) ("As we have explained, forms that 'require[ ] the physician only to check boxes and briefly to fill in blanks . . . are weak evidence at best.'") (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)); *Brunson*, 704 F. App'x at 59−60 (finding that the ALJ "appropriately gave less weight" to medical opinions where although one physician concluded the plaintiff "was limited in his work abilities, his report lacked adequate support for this determination" and that physician's "conclusion conflicted with both [the plaintiff's] self-reported daily activities and [the physician's] own positive reports after [] surgery" and discounted another physician's opinion as "inconsistent with the record evidence[,]" including that physician's "own findings that [the plaintiff] maintained normal grip strength and intact reflexes"); *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2012) ("The Social Security regulations impose no limit on how much time may pass between a [reviewing state agency physician's] report and the ALJ's decision in reliance on it."); *Smith v. Astrue*, 359 F. App'x 313, 316 (3d Cir. 2009) (concluding that, where the treating source's "medical opinion is contradicted by several pieces of evidence in the record and also contains internal inconsistencies, it is not entitled to the level of deference otherwise accorded to a treating physician's opinion"); *Zonak v. Comm'r of Soc. Sec.*, 290 F. App'x 493, 497 (3d Cir. 2008) ("[T]he ALJ was not obligated to give significant weight to Dr. Kumar's opinion as to

Zonak's ability to work because the opinion related to the ultimate issue of disability—an issue reserved exclusively to the Commissioner."); *Phillips v. Barnhart*, 91 F. App'x 775, 780 (3d Cir. 2004) (concluding that the ALJ appropriately assigned limited weight to a treating physician's opinion where his "treatment notes, and in particular the treatment notes during the [relevant period], d[id] not support a finding that [plaintiff] was disabled at any time").

Plaintiff, however, raises a number of challenges to ALJ Bell's consideration of Dr. Press's opinions, arguing that ALJ Bell failed to give good reasons for "rejecting" these treating provider's pinions. *Plaintiff's Brief*, ECF No. 15, pp. 11–21. Plaintiff first complains that ALJ Bell erred in assigning "great weight" to the "remote" opinions of the state agency reviewing consultants, Dr. Floyd and Dr. McKenzie. *Id.* at 12–13. According to Plaintiff, Dr. Floyd and Dr. McKenzie did not have the opportunity to review years of evidence submitted after these opinions were rendered in November 2014 and May 2015, including the opinions of Dr. Press and "any of the records beginning with 'Exhibit 17F [R. 775–1412.]'" *Id.* Plaintiff's arguments are not well taken. As a preliminary matter, Dr. McKenzie did in fact consider Dr. Press's 2014 MRFC, as well as Dr. Press's neuropsychological testing performed in 2014, R. 114, but nevertheless went on to conclude that Plaintiff had only mild difficulties in maintaining social functioning and a moderate restriction of activities of daily living and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation of extended duration. R. 121. In any event, state agency physicians are experts in Social Security disability programs. SSR 96-6p. "An ALJ may not ignore these opinions and must explain the weight given to them." *Neal v. Comm'r of Soc. Sec.*, 57 F. App'x 976, 979 (3d Cir. 2003). An ALJ may rely on a state agency physician's findings and conclusions even where there is a lapse of time between the state agency report and the ALJ's decision and where additional medical evidence is

later submitted. *Chandler*, 667 F.3d at 361 ("The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it. Only where 'additional medical evidence is received that *in the opinion of the [ALJ]* . . . may change the State agency medical . . . consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing,' is an update to the report required.") (emphasis in original) (citations omitted); *Wilson v. Astrue*, 331 F. App'x 917, 919 (3d Cir. 2009) ("Generally, an ALJ is required to consider the reports of State agency medical consultants; however, there is no requirement that an ALJ must always receive an updated report from the State medical experts whenever new medical evidence is available."). Accordingly, in the case presently before the Court, ALJ Bell did not err when assigning great weight to the reviewing state agency physicians' opinions issued in November 2014 and May 2015 simply because additional medical evidence was later submitted. *See id.* Notably, Plaintiff fails to explain how any specific medical evidence later submitted would result in a different mental RFC or an award of benefits. *See Plaintiff's Brief*, ECF No. 15, pp. 12–13 (generally referring to Dr. Press's opinions and Exhibits 17F through 28F without any accompanying explanation); *see also Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination. . . . [T]he party seeking reversal normally must explain why the erroneous ruling caused harm."); *Padgett v. Comm'r of Soc. Sec.*, No. CV 16-9441, 2018 WL 1399307, at *2 (D.N.J. Mar. 20, 2018) ("[B]ecause Plaintiff has articulated no analysis of the evidence, the Court does not understand what argument Plaintiff has made here. Plaintiff has done no more than thrown down a few pieces of an unknown jigsaw puzzle and left it to the Court to put them together. The Court does not assemble arguments for a party from fragments."). Moreover, "[s]imply because these opinions were rendered by state agency

physicians who did not have a treating relationship with Plaintiff does not, as discussed in the aforementioned precedent, mean that the ALJ could not give them significant weight[.]" *Jones v. Colvin*, No. 3:14-CV-2337, 2016 WL 1071021, at *12 (M.D. Pa. Mar. 17, 2016); *cf. Chandler*, 667 F.3d at 361 ("State agent opinions merit significant consideration").

Plaintiff next objects to ALJ Bell's finding that the checkbox format of the 2014 MRFC and 2016 MRFC decreased the probative value of these opinions. *Plaintiff's Brief*, ECF No. 15, p. 14 (citing R. 24). Plaintiff notes that Dr. Press, who had treated Plaintiff since October 2013, also provided written statements in support of her answers. *Id*. The Court is not persuaded that this issue requires remand. As previously noted, ALJ Bell did not err in considering the checkbox format of the 2014 MRFC and 2016 MRFC when discounting these opinions. *See Galette*, 708 F. App'x at 91; *see also Mason*, 994 F.2d at 1065 ("Form reports in which a physician's obligation is only to check a box *or fill in a blank* are weak evidence at best.") (emphasis added). In any event, the checkbox format of the 2014 MRFC and 2016 MRFC was but one factor that ALJ Bell considered when discounting these opinions. R. 24.

Plaintiff goes on to contend that ALJ Bell erred when concluding that the March 2014 MRFC–which indicated that Plaintiff was seriously limited or unable to meet standards in most areas of mental functioning with the need to miss four days of work per month–was inconsistent with Plaintiff's "generally mild objective deficits" noted during the consultative examination conducted by Shapar Farzad, Ph.D., on August 19, 2014. *Plaintiff's Brief*, ECF No. 15, pp. 14–15 (citing R. 24); *see also* R. 24 (citing Exhibit 8F, R. 617–21 (containing a copy of Dr. Farzad's consultative examination). Plaintiff specifically argues that ALJ Bell failed to acknowledge Dr. Farzad's findings that supported Dr. Press's 2014 MRFC, including the findings that Plaintiff had a withdrawn affect, that "a few times she needed to be refocused on the topics," and that

31

Plaintiff "will need assistance in managing her funds due to reported cognitive difficulties;" Dr. Farzad also recommended that Plaintiff undergo "neuropsychological evaluation to address specific cognitive difficulties." *Plaintiff's Brief*, ECF No. 15, p. 15 (quoting R. 618–19) (internal quotation marks omitted). However, the Court is not persuaded that ALJ Bell erred in characterizing Dr. Press's 2014 MRFC and its severe restrictions as inconsistent with the generally mild findings of Dr. Farzad:

> [Plaintiff] was cooperative during these procedures. Her social skills and manner of relating to this examiner were adequate. She looked her stated age. She was casually dressed and adequately groomed. She wore eye glasses. Her receptive and expressive language skills were adequate for these procedures. She was *mildly inattentive* and a few times she needed to be refocused on the topics. Her speech was *mildly slow in rate*, and at times, she had difficulty providing a detailed sequence of events. Her affect was both withdrawn and *mildly anxious*. Her mood was calm, but became *mildly anxious* as she talked about dementia and her cognitive difficulties. *Her thought processes were coherent. There was no evidence of hallucinations, delusions or paranoia in evaluation setting. She was oriented times three.* Her attention and concentration were *mildly reduced* for these procedures. She did serial threes from 100 into the 70s and made two mistakes. She was able to do simple calculations without the use of paper and pencil. Her recent memory was *mildly reduced* for these procedures. She was able to recall 3/3 objects immediately and 2/3 after five minutes. Her average span was 5 digits forwards and 3 digits backward. She was able to spell the word flowers both forward and backwards. Her *general fund of information was fair* for these procedures. She knew the current President of the United States, but not the President before him. She knew the Nation's Capital and Capital of NJ. *Her understanding of abstract concepts was adequate. Her insight and judgment were judged to be good at this time.*

R. 618–19 (emphasis added); *see also* R. 219 (opining that Plaintiff's "[p]rognosis is fair given adequate intervention and compliance with her treatment" even though he found that Plaintiff "will need assistance in managing her funds due to reported cognitive difficulties").

Plaintiff also takes issue with ALJ Bell's conclusion that Dr. Press's 2014 MRFC—which was completed shortly after the alleged onset date September 1, 2013—was inconsistent with the record documenting "improvement" and "stabilization" and that the 2016 MRFC was

inconsistent with any "stabilization" of Plaintiff's conditions with continued treatment.

*Plaintiff's Brief*, ECF No. 15, pp. 15–16 (quoting R. 24) (internal quotation marks omitted).

Plaintiff specifically argues that ALJ Bell relied on a "highly selective" description of Plaintiff's

condition and that ALJ Bell "failed to acknowledge" contrary evidence. *Id*. The Court, however,

finds that ALJ Bell fairly found such improvement and stabilization and appropriately took this

evidence into consideration when discounting Dr. Press's 2014 MRFC and 2016 MRFC. For

example, while Plaintiff points to examination findings of Vijay Peddu, M.D., that she believes

undermines ALJ Bell's assessment, *see id*. (citations omitted), ALJ Bell expressly noted these

findings, but also noted improvement:

> The record also documents that during treatment, the claimant has reported symptoms of depression and anxiety, and the claimant has received mental health treatment and medication management with Vijaya Peddu, MD. The claimant was often initially observed to be depressed, sad, and anxious with circumstantial thoughts and distractibility (7F/2-6, 14F, 24F, 27F). Yet, with continued treatment, the claimant began to show a euthymic mood and affect with goal directed thoughts and normal attention at multiple visits, and the claimant, more recently, has denied symptoms of depression and anxiety during counseling (14F/3, 4, 5, 6, 7, 24F/20, 24, 28, 27F).
>
> The claimant has also denied psychiatric symptoms at multiple primary care and other treatment visits, suggesting that the claimant's treatment and medication has been effective in stabilizing her symptoms (see, e.g., 17F/6, 11, 25F/17, 27, 26F/25). In fact, at numerous primary care and endocrinology visits, the claimant has been observed to be cooperative and fully oriented with a normal mood and affect, and deficits, such as anxiety, have been noted only sporadically (2F/13, 4F/3, 10, 9F/7, 12, 15F, 17F, 19F/9, 20, 24, 26F). The claimant has also indicated that her conditions were controlled on medication (19F/29).

R. 21–22. Notably, Plaintiff concedes that "the ALJ was correct to note that some of these visits

indicated improvement." *Plaintiff's Brief*, ECF No. 15, p. 16. The Court must "uphold the ALJ's

decision even if there is contrary evidence that would justify the opposite conclusion, as long as

the 'substantial evidence' standard is satisfied." *Johnson v. Comm'r of Soc. Sec.*, 497 F. App'x

199, 201 (3d Cir. 2012) (citing *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986)); *see also*

*Chandler,* 667 F.3d at 359 ("Courts are not permitted to reweigh the evidence or impose their own factual determinations [under the substantial evidence standard]."); *Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 880 (3d Cir. 2005) ("When 'presented with the not uncommon situation of conflicting medical evidence . . . [t]he trier of fact has the duty to resolve that conflict.'") (quoting *Richardson v. Perales*, 402 U.S. 389, 399 (1971)). This Court therefore declines Plaintiff's invitation to re-weigh the evidence or to impose its own factual determinations on this record. *See Chandler*, 667 F.3d at 359; *Zirnsak,* 777 F.3d at 611 (stating that a reviewing court "must not substitute [its] own judgment for that of the fact finder").

Plaintiff next complains that, although an ALJ may consider a plaintiff's daily activities, ALJ Bell erred when relying on "a highly selective description of the record describing those activities." *Plaintiff's Brief*, ECF No. 15, pp. 17−18. Plaintiff specifically complains that ALJ Bell failed to consider Plaintiff's testimony that her husband did the cooking, cleaning, and laundry, as well as her husband's testimony that, although Plaintiff used to do those activities, he has started to help with housework, shopping, and taking care of the children. *Id*. Plaintiff's arguments are not well taken. As Plaintiff acknowledges, *id*. at 17, ALJ Bell properly considered Plaintiff's activities of daily living when assessing Dr. Press's opinions. *See Brunson*, 704 F. App'x at 59−60 (finding that the ALJ "appropriately gave less weight" to medical opinions where physician's opinion conflicted with, *inter alia*, the claimant's daily activities); *Cunningham v. Comm'r of Soc. Sec.*, 507 F. App'x 111, 118 (3d Cir. 2012) ("[I]t is appropriate for an ALJ to consider the number and type of activities in which a claimant engages when assessing his or her residual functional capacity."). In the present case, ALJ Bell acknowledged that Plaintiff alleged an inability to perform daily activities, but discounted these allegations as follows:

34

> The claimant has also alleged a significantly inability to perform many daily activities due to her poor cognition and low motivation. However, the claimant's treatment notes do not support the extent to which the claimant alleges she is limited. During the period at issue, the claimant noted that she was exercising daily and that she was taking a quilting class (23F/3). She also admitted that she cooked herself breakfast, went to exercise classes, walked her dog, read, did laundry, and performed childcare for her granddaughter (19F/46, 61), evidence in total suggesting a greater mental functional ability than alleged.

R. 22; *see also* R.19 (same), 23 (same), 373 (reflecting Plaintiff's statement in Function Report that she is able to perform household chores, walk dogs, get coffee, attend exercise class, go shopping when necessary, do laundry, cook dinner, and clean up). ALJ Bell also considered Plaintiff's husband's testimony but discounted this testimony, reasoning as follows:

> Further, the extent to which the claimant's husband states that the claimant is limited does not suggest the need for greater limitation than indicated above. For example, while the claimant's husband reports that the claimant has trouble dealing with stress and completing tasks, the claimant's treatment has been routine when compliant with medication, and the claimant is able to cook, do laundry, go to exercise classes, and perform childcare. Moreover, while the claimant's husband testified that the claimant has panic attacks and is verbally abusive, the claimant's treatment notes reflect that the claimant's anxiety and other mental conditions have generally stabilized with treatment. Thus, I grant little weight to these statements, and they do not evidence greater limitations than those already indicated.

R. 23–24. Based on this record, the Court finds that ALJ Bell appropriately considered the evidence regarding Plaintiff's daily activities.[6] *See Hatton*, 131 F. App'x at 880 ("When 'presented with the not uncommon situation of conflicting medical evidence . . . [t]he trier of fact has the duty to resolve that conflict.'") (quoting *Richardson v. Perales*, 402 U.S. 389, 399 (1971)); *Davison v. Comm'r of Soc. Sec.*, No. CV 18-15840, 2020 WL 3638414, at *8 (D.N.J. July 6, 2020) ("The ALJ cited to multiple other reports and surveyed a significant amount of evidence. He was not required to discuss or describe every page of the record. He did not, as [the

---

[6] The Court later addresses Plaintiff's challenges to ALJ Bell's consideration of her subjective complaints.

claimant] seems to suggest, cherry pick a handful of positive statements out of a universe of negative statements."); *Lewis v. Comm'r of Soc. Sec.*, No. 15CV06275, 2017 WL 6329703, at *8 (D.N.J. Dec. 11, 2017) ("Though the Plaintiff accuses the ALJ of cherry-picking evidence, it actually appears that the Plaintiff is the one guilty of cherry-picking since the bulk of the medical record seems to indicate minimal issues with executive function and mental capabilities."). The Court therefore declines Plaintiff's invitation to re-weigh the evidence or to impose Plaintiff's or this Court's own factual determination. *See Chandler*, 667 F.3d at 359; *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Circ. 2014) (stating that a reviewing court "must not substitute [its] own judgment for that of the fact finder").

Plaintiff goes on to argue that ALJ Bell erred in discounting Dr. Press's May 2017 Therapeutic Letter and February 2020 Therapeutic Letter. *Plaintiff's Brief*, ECF No. 15, pp.18–20. This Court disagrees. As detailed above, ALJ Bell properly discounted these letters to the extent that Dr. Press opined that Plaintiff was unable to work, which is a matter reserved to the Commissioner, and because they did not provide a function-by-function analysis. R. 23; *see also Louis*, 808 F. App'x at 118; *Zonak*, 290 F. App'x at 497; *Paczkoski v. Colvin*, No. 3:13-CV-01775, 2014 WL 4384684, at *9 (M.D. Pa. Sept. 4, 2014) (affirming a denial of benefits where the ALJ afforded little weight to treating doctor's assessments where the doctor "did not opine that [the claimant] had any specific functional limitations or that he was disabled. . . . Thus, there was no opinion of functionality by [the treating doctor] that the ALJ could weigh"). In addition, ALJ Bell discounted Dr. Press's May 2017 Therapeutic Letter and February 2020 Therapeutic Letter because the factual statements supporting these letters were not entirely consistent with Plaintiff's actual functioning; for example, Dr. Press stated that Plaintiff was unable to do anything besides watch television, but the record showed that Plaintiff engaged in multiple daily

36

activities. R. 23−24. To the extent that Plaintiff points to evidence that she believes undermines ALJ Bell's consideration in this regard, that argument is not successful for the reasons previously discussed. *See Johnson*, 497 F. App'x at 201; *Chandler*, 667 F.3d at 359; *Hatton*, 131 F. App'x at 880.

Finally, Plaintiff contends that ALJ Bell impermissibly relied on his own lay opinion to discount Dr. Press's opinions; instead, Plaintiff argues, ALJ Bell should have ordered the testimony of a medical expert, ordered a more recent consultative examination, or recontacted Dr. Press with questions.. *Plaintiff's Brief*, ECF No. 15, pp. 20−21. Plaintiff's argument is not well taken. As a preliminary matter, as set forth above, ALJ Bell properly relied on record evidence, including opinions from the state agency reviewing consultants, and not merely his own lay opinion as Plaintiff suggests, when discounting Dr. Press's opinions. R. 23−24. Moreover, an ALJ is vested with broad discretion in determining whether to consult with a medical expert. *Hardee v. Comm'r of Soc. Sec*., 188 F. App'x 127, 129 (3d Cir. 2006); *see also* 20 C.F.R. § 404.1529(b) ("At the administrative law judge hearing or Appeals Council level of the administrative review process, the adjudicator(s) *may* ask for and consider the opinion of a medical or psychological expert concerning whether your impairment(s) could reasonably be expected to produce your alleged symptoms.") (emphasis added); *Miguel v. Comm'r of Soc. Sec.,* 129 F. App'x 678, 680 (3d Cir. 2005) (The regulations do not require that a medical expert testify at the claimant's hearing."). Similarly, "[t]he decision to order a consultative examination is within the sound discretion of the ALJ" and, therefore, "the ALJ's duty to develop the record does not require a consultative examination unless the claimant establishes that such an examination is necessary to enable the ALJ to make the disability decision." *Thompson v. Halter*, 45 F. App'x 146, 148–49 (3d Cir. 2002) (citations omitted). Likewise, an ALJ is required to

recontact a medical source for clarification only "when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear. . . . " SSR 96-5p. In the present case, ALJ Bell considered years of objective medical evidence as well as the opinions of reviewing and examining physicians and implicitly determined that he had sufficient information to reach a conclusion. ALJ Bell acted within his discretion in not ordering the testimony of a medical expert[7] or a consultative examination or in recontacting Dr. Press.

Accordingly, for all these reasons, the ALJ's consideration of Dr. Press's opinions enjoys substantial support in the record.

## B.      Subjective Complaints

Plaintiff also challenges ALJ Bell's consideration of her subjective complaints. *Plaintiff's Brief*, ECF No. 15, pp. 22–25. Plaintiff's arguments are not well taken.

"Subjective allegations of pain or other symptoms cannot alone establish a disability." *Miller v. Comm'r of Soc. Sec.*, 719 F. App'x 130, 134 (3d Cir. 2017) (citing 20 C.F.R. § 416.929(a)). Instead, objective medical evidence must corroborate a claimant's subjective complaints. *Prokopick v. Comm'r of Soc. Sec.*, 272 F. App'x 196, 199 (3d Cir. 2008) (citing 20 C.F.R. § 404.1529(a)). Specifically, an ALJ must follow a two-step process in evaluating a claimant's subjective complaints. SSR 16-3p, 2016 WL 1119029 (March 16, 2016). First, the ALJ "must consider whether there is an underlying medically determinable physical or mental

---

[7] To the extent that Plaintiff suggests that ALJ Bell failed to comply with the Appeals Council's remand order when he failed to order a medical expert, *Plaintiff's Brief*, ECF No. 15, p.21 n.10, this Court lacks the authority to determine whether an ALJ complied with such remand order. *See Miller v. Saul*, No. 3:19-CV-01726, 2020 WL 6822974, at *10 (M.D. Pa. Nov. 20, 2020), *aff'd sub nom. Miller v. Comm'r of Soc. Sec.*, No. 20-3642, 2021 WL 3137439 (3d Cir. July 26, 2021); *Pearson v. Colvin*, No. CV 14-4666, 2015 WL 9581749, at *4 (D.N.J. Dec. 30, 2015) ("The appropriate focus for review is upon the ALJ's final decision, not the prior Appeals Council remand order.").

impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." *Id.* "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities[.]" *Id.*; *see also Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) ("[Evaluation of the intensity and persistence of the pain or symptom and the extent to which it affects the ability to work] obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it.") (citing 20 C.F.R. § 404.1529(c)). In conducting this evaluation, an ALJ must consider the objective medical evidence as well as other evidence relevant to a claimant's subjective symptoms. 20 C.F.R. § 404.1529(c)(3) (listing the following factors to consider: daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate pain or other symptoms; treatment, other than medication, currently received or have received for relief of pain or other symptoms; any measures currently used or have used to relieve pain or other symptoms; and other factors concerning your functional limitations and restrictions due to pain or other symptoms). Finally, an "ALJ has wide discretion to weigh the claimant's subjective complaints, *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983), and may discount them where they are unsupported by other relevant objective evidence." *Miller*, 719 F. App'x at 134 (citing 20 C.F.R. § 416.929(c)); *see also Izzo v. Comm'r of Soc. Sec.*, 186 F. App'x 280, 286 (3d Cir. 2006) ("[A]

reviewing court typically defers to an ALJ's credibility determination so long as there is a sufficient basis for the ALJ's decision to discredit a witness.").[8]

Here, ALJ Bell followed this two-step evaluation process in considering Plaintiff's subjective complaints. ALJ Bell found that Plaintiff's medically determinable impairments could reasonably be expected to cause symptoms, but that Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." R. 20. As previously discussed, ALJ Bell detailed years of medical evidence and record testimony to support his findings, including, *inter alia*, mental status examinations that reflected that she was alert, oriented with normal attention; imaging of the brain that showed only mild age-related changes without evidence of acute abnormality; improvement on medication; Plaintiff's denial of symptoms of depression and anxiety during counseling; Plaintiff's denial of psychiatric symptoms at multiple treatment visits; generally conservative care; the fact that Plaintiff's complaints of side effects from medication were generally resolved once Plaintiff switched medicines; and her daily activities. R. 20−25. ALJ Bell went on to explain as follows:

> In sum, the claimant has continually attended therapy, has been prescribed medication, and has taken appropriate medications for her conditions, which weighs in the claimant's favor, but the evidence of record does not support the extent to which the claimant alleges she is limited. As discussed, the medical records reveal that the claimant's medications have been relatively effective in stabilizing the claimant's bipolar, depressive, and anxiety-related symptoms. Further, despite the claimant's subjective cognitive deficits, the claimant's treatment notes, such as her neurology visits, document generally adequate memory recall, comprehension, and mini-mental status examinations, and the claimant has

---

[8]SSR 16-3p superseded SSR 96-7p on March 26, 2016, and eliminated the use of the term "credibility." SSR 16-3p. However, "while SSR 16-3P clarifies that adjudicators should not make statements about an individual's truthfulness, the overarching task of assessing whether an individual's statements are consistent with other record evidence remains the same." *Levyash v. Colvin*, No. CV 16-2189, 2018 WL 1559769, at *8 (D.N.J. Mar. 30, 2018).

been able to perform daily activities as described above, such attending exercise classes, cooking, laundry, and childcare.

R. 22–23. In the view of this Court, this record provides substantial support for ALJ Bell's decision to discount Plaintiff's subjective statements as inconsistent with the record evidence. *Van Horn*, 717 F.2d at 873; *Miller*, 719 F. App'x at 134; *Izzo*, 186 F. App'x at 286.

Plaintiff, however, contends that ALJ Bell erred when evaluating her subjective complaints because he failed to consider Plaintiff's "strong work history." *Plaintiff's Brief*, ECF No. 15, pp. 22–25. The Court is not persuaded that this issue requires remand. The United States Court of Appeals for the Third Circuit has upheld an ALJ's evaluation of a claimant's subjective complaints where the ALJ did not "explicitly discuss his years of uninterrupted employment[,]" but where the ALJ did explain why other evidence in the record belied the claimant's subjective complaints. *Sanborn v. Comm'r of Soc. Sec.*, 613 F. App'x 171, 177 (3d Cir. 2015); *see also Forcinito v. Comm'r of Soc. Sec.*, No. CIV. 12-6940, 2014 WL 252095, at \*9 (D.N.J. Jan. 23, 2014) ("[W]ork history is only one of many factors the ALJ may consider in assessing claimant's credibility. . . . Work history is not dispositive of credibility and the question of credibility is left to the ALJ's discretion after considering all of the relevant factors.") (citations omitted). Here, as noted above, the ALJ detailed why other record evidence undermined Plaintiff's subjective complaints. R. 20–25. Accordingly, the Court finds that ALJ Bell sufficiently explained his reasoning in evaluating Plaintiff's subjective complaints. ALJ Bell's findings in this regard are supported by substantial evidence in the record and are therefore entitled to this Court's deference. *See id.*; SSR 16-3p; *Miller*, 719 F. App'x at 134; *cf. Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x. 761, 765 (3d Cir. 2009) ("Credibility determinations as to a claimant's testimony regarding pain and other subjective complaints are for the ALJ to make.") (citing *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)); *Davis v. Comm'r Soc. Sec.*, 105 F. App'x 319,

322 (3d Cir. 2004) (finding that the ALJ sufficiently evaluated the plaintiff's testimony where "the ALJ devoted two pages to a discussion of claimant's subjective complaints and cited Claimant's daily activities and objective medical reports"). ALJ Bell's assessment of Plaintiff's subjective complaints will not serve as a basis for remand of this action. *Id*.

## VI.    CONCLUSION

For these reasons, the Court **AFFIRMS** the Commissioner's decision.

The Court will issue a separate Order issuing final judgment pursuant to Sentence 4 of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**


Date:  April 14, 2022                                        *s/Norah McCann King*
                                                            NORAH McCANN KING
                                                            UNITED STATES MAGISTRATE JUDGE